**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

CASE NO.:

WILLIAM PAUL AIKMAN,

Plaintiff,

v.

BANK OF AMERICA, N.A.
and AT&T, INC.,

Defendants.
_______________________________/

**COMPLAINT**
**JURY TRIAL DEMAND**

Plaintiff, William Paul Aikman ("Mr. Aikman" or "Plaintiff"), sues Defendant, Bank of America, N.A. ("Bank of America"), for violations of the Truth in Lending Act (the "TILA"), 15 U.S.C. §§ 1640(a) and 1643, and its implementing regulation, Regulation Z, 12 C.F.R. § 1026.12(b). Plaintiff further sues Defendant, AT&T, Inc. and its wholly owned affiliates ("AT&T"), for violations of the Communications Act of 1934, 47 U.S.C. § 151, *et seq.* (the "CA").

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1640(e) because Mr. Aikman's claims arise under the TILA and the CA.

2. Venue lies in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims set forth herein occurred in Orange County, Florida, where Mr. Aikman lives.

3. This Court has personal jurisdiction because Bank of America extended credit on the account at issue to Mr. Aikman in Florida and addressed its claim letters to him in Florida, and AT&T provided a telephone number and an account to Plaintiff in Florida.

## PARTIES

4. At all times relevant hereto, Mr. Aikman is and was a natural person living in Orlando, Orange County, Florida.

5. At all times relevant hereto, Bank of America is and was a national banking association with its main office located in Charlotte, North Carolina.

6. Bank of America issues credit cards, extends open-end consumer credit that carries finance charges, and operates branches in Florida, including its South Orlando Financial Center.

7. At all times relevant hereto, AT&T is and was a national telecommunications company with its main office located in Dallas, Texas.

8. AT&T is a "Common Carrier" governed by the Federal Communications Act ("CA"), 47 U.S.C. § 151, *et seq.* and regulated by the Federal Communications Commission ("FCC") for its acts and practices, including those occurring in Florida.

## FACTUAL ALLEGATIONS

9. Bank of America issued Mr. Aikman a Mastercard credit card (the "Card") on an open-end credit account (the "Account").

10. Mr. Aikman requested and received the Card and used it to buy goods and services, and the Card's account number can be used to buy goods and services, including on the Internet.

11. Mr. Aikman has held a Bank of America credit card for more than twenty years, and he pays his monthly bill in full, on time, or early.

12. Mr. Aikman uses the Account for personal, family, and household purposes, and no real property or dwelling secures it.

13. Mr. Aikman does not take cash advances on his credit card, and he had never taken one on the Account before June 24, 2026.

14. On June 23, 2026, Mr. Aikman's AT&T telephone line lost its dial tone, and the number no longer appeared on his AT&T account.

15. Subsequent to losing his telephone line, Mr. Aikman became aware that an unknown third party had committed "port-out fraud" in relation to his AT&T telephone number and transferred it to a mobile TracFone or Total Wireless account.

16. When ''port-out fraud'' occurs, a bad actor, posing as the victim, opens an account with a carrier other than the victim's current carrier. The bad actor then arranges for the victim's phone number to be transferred to (or ''ported out'') to the account with the new carrier controlled by the bad actor. *See* 47 C.F.R. Parts 52 and 64 (Federal Register October 15, 2021).

17. At 12:40 p.m. that day, Mr. Aikman reported the "port-out fraud" to AT&T, which opened fraud case SF_313413090.

18. At 5:37 p.m., Mr. Aikman called his own telephone number from a telephone at an AT&T store, and an unknown woman answered.

19. Despite notifying AT&T of the "port-out fraud" associated with his telephone number and account, AT&T did not restore the telephone number to Mr. Aikman's account until July 9, 2026.

20. On that same day, July 23, 2026, Mr. Aikman also filed a formal complaint with the FCC regarding the "port-out fraud" of his AT&T telephone number and account.

21. On June 24, 2026, the day after Mr. Aikman lost his telephone number, a $4,700.00 cash advance posted to the Account, and Bank of America charged a $188.00 transaction fee on it.

22. Upon information and belief, Mr. Aikman's fraudulently ported AT&T telephone number was used to perpetrate the $4,700.00 cash advance.

23. The Account statement listed the $4,700.00 as a cash advance by direct deposit, and the entry identified Varo Bank, N.A. ("Varo").

24. Mr. Aikman did not request, initiate, or approve the cash advance.

25. Mr. Aikman never gave anyone the Card, its number, or his online banking credentials, never gave anyone permission to use the Account, and never told Bank of America that anyone else could use it.

26. Mr. Aikman has never had any contact with Varo or done business with it, and he did not know Varo existed until he saw its name on his statement.

27. Mr. Aikman has no access to any Varo account, and he received none of the $4,700.00.

28. The $4,700.00 did not pay an overdraft on any Bank of America deposit account of Mr. Aikman's, and no part of it went to any account he owns or controls.

29. Mr. Aikman found the cash advance on July 10, 2026, while reviewing his Account statement before paying his monthly bills.

30. That day, he called Bank of America's fraud claims line and reported the $4,700.00 cash advance as fraud.

31. Bank of America opened fraud claim number 260710G18C86 for $4,700.00 on July 10, 2026.

32. By letter dated July 10, 2026, Bank of America wrote: "William, we're temporarily crediting your account for $4,700.00 while we research your claim."

33. The same letter promised: "While we're researching your claim, you don't have to pay any part of the disputed amount."

34. A second letter, also dated July 10, 2026, and bearing the same claim number, said: "William, we're unable to approve your recent claim."

35. The letter gave this reason: "We confirmed that the charge on your card either covered an overdraft on your linked deposit account as part of your Balance Connect™ for overdraft protection or was a balance transfer that went directly into an account in your name."

36. Bank of America did not say which of the two had happened.

37. The letter said Bank of America's research included "the information you provided with your claim, your account history, the monthly account statements we sent you and if available, information from the merchant, such as a signed receipt or contract."

38. Mr. Aikman bought nothing from any merchant with the cash advance, and he signed no receipt or contract for it.

39. The denial letter did not say who requested the cash advance, how the request reached Bank of America, or what device, location, or internet address it came from.

40. Bank of America would not give Mr. Aikman any details of the transaction, and its customer service agent could not see further details of it either.

41. The denial letter told Mr. Aikman that the temporary credit "will be removed" and would appear on his monthly statement "along with any additional charges or fees you owe."

42. Bank of America changed Mr. Aikman's card number and issued him a new card.

43. On July 15, 2026, Mr. Aikman called Bank of America's fraud claims department and asked it to reconsider claim 260710G18C86.

44. On July 13, 2026, three days after the denial, the Account balance was $7,738.94, and $4,888.00 of it was the $4,700.00 cash advance and the $188.00 fee.

45. That day, Mr. Aikman paid $2,850.94, the part of the balance he did not dispute.

46. On July 16, 2026, the day after he asked Bank of America to reconsider, Mr. Aikman went to its South Orlando Financial Center, spoke with a relationship banker, and paid the $4,888.00 by personal check at the teller.

47. Mr. Aikman paid to avoid interest at 29.99% on a balance he did not owe and negative credit reporting.

48. Mr. Aikman reported the theft to the FBI's Internet Crime Complaint Center on July 13, 2026, to the Orange County Sheriff's Office on July 22, 2026, and to the Federal Trade Commission, in an Identity Theft Report, on July 23, 2026.

49. Bank of America has not returned the $4,888.00.

50. On information and belief, Bank of America's records show how the June 24 request was made, including the channel, device, internet address, and location used. The belief rests on the fact that Bank of America received the request and processed it.

51. On information and belief, the person who made the request presented neither the physical Card nor anything else that identified Mr. Aikman as the person making it.

52. The belief rests on Mr. Aikman's not having made the request and on Bank of America's letter, which describes either an overdraft transfer or "a balance transfer that went directly into an account in your name."

53. On information and belief, if the Varo account bears Mr. Aikman's name, someone other than Mr. Aikman opened it with his personal information and by using his fraudulently ported AT&T telephone number.

54. The belief rests on his never having dealt with Varo and on the credit application someone made in his name that Citibank's June 28, 2026, letter rejected.

55. On information and belief, Bank of America's records of the Account show no cash advances before June 24, 2026.

**COUNT I**
**Violation of the TILA**
**as to Bank of America**

56. Plaintiff re-alleges and incorporates the relevant paragraphs above, as if fully set forth herein.

57. Bank of America issued the Card, so it is a "card issuer" under 15 U.S.C. § 1602(o).

58. Bank of America regularly extends consumer credit for which a finance charge is or may be required, and the Account balance is payable to Bank of America, so it is a "creditor" under 15 U.S.C. § 1602(g).

59. Bank of America issued the Card to Mr. Aikman, so he is a "cardholder" under 15 U.S.C. § 1602(n).

60. The Card is a "credit card," and because Mr. Aikman requested, received, and used it, it is an "accepted credit card." 15 U.S.C. § 1602(l), (m).

61. Because the Card's account number can be used to buy goods and services, the account number is itself a credit card, "regardless of whether the creditor treats such transactions as purchases, cash advances, or some other type of transaction." 12 C.F.R. pt. 1026, Supp. I, cmt. 2(a)(15)-2.ii.C.

62. The Account is an "open end consumer credit plan" not secured by real property or a dwelling because Bank of America contemplates repeated transactions on it, sets their terms, and charges finance charges on the unpaid balance, and extends the credit to Mr. Aikman, a natural person, for personal, family, and household purposes. 15 U.S.C. § 1602(i), (j).

63. On June 24, 2026, a person other than Mr. Aikman used his credit card to obtain a $4,700.00 cash advance, and Bank of America's own denial letter calls it "the charge on your card."

64. That person had no actual authority because Mr. Aikman did not request, initiate, or approve the cash advance.

65. That person had no implied or apparent authority because Mr. Aikman gave no one the Card, its number, his credentials, or permission to use the Account, and he never told Bank of America that anyone else could use it.

66. Mr. Aikman received no benefit from the cash advance because the $4,700.00 went to Varo, a bank he has never dealt with, he has no access to any Varo account, and he received none of the money.

67. The June 24 cash advance was therefore an "unauthorized use" of a credit card under 15 U.S.C. § 1602(p) and 12 C.F.R. § 1026.12(b)(1)(i), which includes

a transaction initiated by a person who "otherwise initiated the transaction, through fraud or robbery." 12 C.F.R. pt. 1026, Supp. I, cmt. 12(b)(1)(ii)-4.

68. Mr. Aikman notified Bank of America of the unauthorized use by telephone on July 10, 2026, and Bank of America opened claim 260710G18C86 that day.

69. Regulation Z lets a cardholder give that notice "in person, by telephone, or in writing." 12 C.F.R. § 1026.12(b)(3).

70. Bank of America could hold Mr. Aikman liable for the unauthorized use only if every condition in 15 U.S.C. § 1643(a)(1) was met and even then for no more than $50. 15 U.S.C. § 1643(a)(1)(B); 12 C.F.R. § 1026.12(b)(1)(ii), (b)(2).

71. "Except as provided in this section, a cardholder incurs no liability from the unauthorized use of a credit card." 15 U.S.C. § 1643(d).

72. One condition is that the card issuer "has provided a means to identify the cardholder on the account or the authorized user of the card." 12 C.F.R. § 1026.12(b)(2)(iii); *see* 15 U.S.C. § 1643(a)(1)(F).

73. When neither the card nor some other sufficient means of identifying the cardholder is presented, the cardholder "may not be held liable." 12 C.F.R. pt. 1026, Supp. I, cmt. 12(b)(2)(iii)-3.

74. If a card issuer seeks to impose liability after a cardholder claims unauthorized use, "the card issuer must conduct a reasonable investigation of the claim." 12 C.F.R. pt. 1026, Supp. I, cmt. 12(b)-3.

75. After Mr. Aikman's July 10 notice, Bank of America held him liable for the $4,700.00 cash advance and the $188.00 fee it charged on it.

76. It denied Mr. Aikman's claim, told him the temporary credit would be removed and to keep paying.

77. Mr. Aikman paid Bank of America the $4,888.00 on July 16, 2026.

78. Bank of America violated 15 U.S.C. § 1643(a)(1)(B) and (d) and 12 C.F.R. § 1026.12(b)(1)(ii) by holding Mr. Aikman liable for $4,888.00 arising from the unauthorized use, which is $4,838.00 more than the $50 limit. *See* ¶ 71.

79. Bank of America also violated 15 U.S.C. § 1643(a)(1)(F) and (d) and 12 C.F.R. § 1026.12(b)(2)(iii) by holding Mr. Aikman liable for any amount when, on information and belief, neither the Card nor any other sufficient means of identifying him was presented.

80. Bank of America also imposed that liability without first conducting the reasonable investigation that Regulation Z makes a precondition to imposing any liability.

81. Bank of America denied the claim in a letter dated the day Mr. Aikman made the claim, gave two explanations without choosing between them, and identified no fact about who made the request or how.

82. Bank of America had before it a cardholder of more than twenty years who pays in full and does not take cash advances, a $4,700.00 cash advance sent to a bank he had never dealt with, and, on information and belief, the device, location, and internet address of the request.

83. Bank of America considered none of it.

84. Section 1643 is part of Part B of TILA, and Bank of America is a creditor that failed to comply with requirements imposed under that Part with respect to Mr. Aikman. 15 U.S.C. § 1640(a).

85. Bank of America's violations cost Mr. Aikman $4,888.00.

86. Had Bank of America complied with § 1643, it could have charged him no more than $50, and on these facts nothing, but it held him liable for the full amount, and he paid it.

87. Mr. Aikman has also lost the use of that $4,888.00 since July 16, 2026.

88. The $188.00 fee is a finance charge in connection with the transaction, because Bank of America imposed it as an incident to the extension of credit. 12 C.F.R. § 1026.4(a), (b)(2).

89. Bank of America is liable to Mr. Aikman for his actual damages of at least $4,888.00 under 15 U.S.C. § 1640(a)(1); statutory damages of twice the finance charge in connection with the transaction, but not less than $500 or more than $5,000, under 15 U.S.C. § 1640(a)(2)(A)(iii); and the costs of this action and a reasonable attorney's fee under 15 U.S.C. § 1640(a)(3).

**COUNT II**
**Violation of the CA**
**as to AT&T**

90. Plaintiff re-alleges and incorporates the relevant paragraphs above, as if fully set forth herein.

91. Section 222(a) of the CA, 47 U.S.C. § 222(a), requires every telecommunications carrier to protect, among other things, the confidentiality of proprietary information of, and relating to, customers ("CPI").

92. Section 222(c)(1) of the CA, 27 U.S.C. § 222(c)(1) further requires that, "[e]xcept as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to customer proprietary network information [CPNI] in its provision of (A) telecommunications services from which such information is derived, or (B) services necessary to or used in the provision of such telecommunication services. ...".

93. Section 222(h)(1), 47 U.S.C. § 222(h)(1), defines customer proprietary network information ("CPNI") as: "(A) information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and (B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier, except that term does not include subscriber list information."

94. The FCC has promulgated rules to implement Section 222 of the CA "to ensure that telecommunications carriers establish effective safeguards to protect against unauthorized use or disclosure of CPNI." *See* 47 CFR § 64.2001, *et seq.* ("CPNI Rules"); *CPNI Order*, 13 FCC Rcd. at 8195 ¶ 193. The CPNI Rules limit disclosure

and use of CPNI without customer approval to certain limited circumstances (such as cooperation with law enforcement), none of which are applicable to the facts here. 47 CFR § 64.2005.

95. The CPNI Rules require carriers to implement safeguards to protect customers' CPNI. These safeguards include: (i) training personnel "as to when they are and are not authorized to use CPNI"; (ii) establishing "a supervisory review process regarding carrier compliance with the rules;" and (iii) filing annual compliance certificates with the FCC. 47 CFR § 64.2009(b), (d), and (e).

96. The CPNI Rules further require carriers to implement measures to prevent the disclosure of CPNI to unauthorized individuals. 47 CFR § 64.2010. For example, "carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." 47 CFR § 64.2010(a).

97. Moreover, "carriers must properly authenticate a customer prior to disclosing CPNI based on customer-initiated telephone contact, online account access, or an in-store visit." *Id.* In the case of in-store access to CPNI, "[a] telecommunications carrier may disclose CPNI to a customer who, at a carrier's retail location, *first presents to the telecommunications carrier or its agent a valid photo ID matching the customer's account information*." 47 CFR § 64.2010(d) (emphasis added). "Valid photo ID" is defined in 47 CFR § 64.2003(r) as "a government-issued means of personal identification with a photograph such as a driver's license, passport, or comparable ID that is not expired."

98. Under section 206 of the CA, 47 U.S.C. § 206, "[i]n case any common carriers shall do, or cause or permit it to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case."

99. The information disclosed by AT&T during and after the port-out fraud occurred, was CPI and CPNI under Section 222 of the CA.

100. AT&T failed to protect the confidentiality of Plaintiff's CPI and CPNI by divulging said information during and after the port-out fraud in furtherance of the cash advance that is the subject on the instant action.

101. Through its negligence, gross negligence and deliberate acts, including without limitation, inexplicable failures to follow its own security procedures, supervise its employees, the applicable telecommunication regulations, and by allowing its employees to bypass such procedures, AT&T permitted unauthorized access to Plaintiff's telephone number and account information.

102. As a direct consequence of AT&T's violations of the CA, Plaintiff has been injured, including without limitation, loss of the ability to use his telephone number, financial loss, loss of time, emotional distress, and for other damages in an amount to be proven at trial.

103. Plaintiff is also entitled to his attorney's fees and costs under the CA in bringing this action against AT&T for its gross negligence and fraudulent misrepresentation as to the security that it provides for customer accounts.

## RELIEF REQUESTED

WHEREFORE, Mr. Aikman asks the Court to enter judgment for him and against Bank of America and AT&T, jointly and severally, for:

a. Actual damages under 15 U.S.C. § 1640(a)(1), including the $4,888.00 collected from him;

b. Statutory damages under 15 U.S.C. § 1640(a)(2)(A)(iii);

c. The costs of this action and a reasonable attorney's fee under 15 U.S.C. § 1640(a)(3);

d. Actual damages under 47 U.S.C. § 206, including the $4,888.00 collected from him;

e. The costs of this action and a reasonable attorney's fee under 47 U.S.C. § 206;

f. Post-judgment interest under 28 U.S.C. § 1961, and prejudgment interest as allowed by law; and

g. Such other relief as the Court finds just.

## JURY TRIAL DEMAND

Mr. Aikman demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Christopher Legg*

Christopher W. Legg, Esq.
FL Bar No.: 0044460
Chris@theconsumerlawyers.com
CHRISTOPHER W. LEGG, P.A.
8965 Sandy Crest Lane
Boynton Beach, Florida 33473
Telephone: 954-962-2333

*/s/ Darren R. Newhart*

Darren R. Newhart, Esq.
FL Bar No.: 0115546
Darren@newhartlegal.com
NEWHART LEGAL, P.A.
14611 Southern Blvd, Suite 1351
Loxahatchee, FL 33470
Telephone: 561-331-1806

*Counsels for Plaintiff*